UNITED STATES DISTRICT COURT

DISTRICT OF SOUTH DAKOTA

WESTERN DIVISION

| | |
|---|---|
| JUSTIN LAMAR FERRELL,<br><br>                    Plaintiff,<br><br>          vs.<br><br>RYAN FITZPATRICK, Correctional Officer at Meade County Jail, in his individual capacity; STACY ULRICH, Acting Supervisor at Meade County Jail, in her individual capacity; RON MERWIN, Sheriff at Meade County Sheriff's Office, in his individual capacity; BOB DOE, Administrator at Meade County Jail, in his individual capacity; DEPUTY DOE, Deputy Meade County Sheriff's Office, in his individual capacity; and MONTE DROPPERS, Position Supervisor at Meade County Jail, in his individual capacity,<br><br>                    Defendants. | CIV. 17-5084-JLV<br><br>ORDER |

## INTRODUCTION

Plaintiff Justin Lamar Ferrell brought this action under 42 U.S.C. § 1983 alleging defendants violated his civil rights while he was incarcerated in the Meade County Jail ("the Jail") in Sturgis, South Dakota, awaiting trial on state charges.   (Docket 23).   Plaintiff primarily asserts defendants, who are all jail and law enforcement officials, unconstitutionally used excessive force in placing him in a restraint chair.   He also raises failure to train, pre-conviction punishment and retaliation claims.   Defendants moved for summary judgment on all claims, arguing their actions do not rise to the level of a constitutional

violation and that they are entitled to qualified immunity.   (Docket 50).
Plaintiff opposes summary judgment on some, but not all, of his claims.
(Docket 59).   For the reasons given below, the court grants defendants summary
judgment on all claims.

## I.   Remaining Claims

Plaintiff's second amended complaint raised seven claims against
defendants in their individual and official capacities.   (Docket 23).   In his
summary judgment brief, plaintiff expressly abandoned two claims and
conceded his official capacity claims should be dismissed.   (Docket 59 at pp. 7,
17, 19).   He also agreed to dismiss the fictitious defendants Bob Doe, the Meade
County Jail Administrator, and Deputy Doe, a Deputy Meade County Sheriff, for
lack of service.[1]   Id. at p. 7.   Accordingly, the remaining individual capacity
claims are:

1. Excessive force claims against Correctional Officers Stacy
   Ulrich ("CO Ulrich") and Ryan Fitzpatrick ("CO Fitzpatrick").

2. Excessive force claim against Correctional Officer Monte
   Droppers.[2]

---

[1]The Jail Administrator is identified in the record as Bob Lehrkamp.
(Docket 52).   Given that plaintiff declined to proceed against Administrator
Lehrkamp and Deputy Doe, the court will consider claims against them waived,
even though insufficiency of service is not a defense at the summary judgment
stage.   See Fed. R. Civ. P. 12(b) (failure of service defense must be made before a
responsive pleading).

[2]Plaintiff's complaint spelled CO Ulrich's and CO Monte Droppers' names
incorrectly.   See Docket 33 at p. 1 (defendants' answer setting out correct
spelling).   The court refers to Tyrel and Monte Droppers, both correctional
officers at the Jail, by their full names to avoid confusion.

3.    Failure to train claim against Meade County Sheriff Ron Merwin.

4.    Fourteenth Amendment due process claim against Sheriff Merwin and COs Ulrich, Fitzpatrick and Monte Droppers for use of restraint chair as punishment.[3]

5.    Retaliation claim against Sheriff Merwin.

The court first makes factual findings and then examines each remaining claim in turn.

## II.   Facts

This factual recitation is derived from the parties' respective statements of undisputed material facts and the supporting record materials.[4]   (Dockets 49, 61 & 62).   The court views these facts in the light most favorable to plaintiff, the nonmoving party.   Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp., 475 U.S. 574, 587-88 (1986).

On August 22, 2017, plaintiff was involved in a motor vehicle accident. (Docket 62 at ¶ 1).   He alleges he "aggravated an existing torn ligament injury in his left wrist" in the accident, necessitating a splint.   Id. at ¶ 2.   He further asserts he sustained head and elbow injuries in the accident.   Id.   Plaintiff was

---

[3]As described below, see infra Section IV.C, the legal nature of this claim is uncertain.   The court construes it as a Fourteenth Amendment due process claim against the defendants in their individual capacities.

[4]Plaintiff responded to defendants' statement of material facts.   (Docket 61).   He also filed his own statement of material facts.   (Docket 62).   In their reply brief, defendants stated they did not intend to respond to plaintiff's facts. (Docket 66 at p. 3 n.1).   Although the court can take plaintiff's proposed facts as true, Fed. R. Civ. P. 56(e)(2); D.S.D. Civ. LR 56.1(D), it will instead weigh plaintiff's facts by the strength of the supporting record evidence.

booked into the Jail that same day.   (Docket 49 at ¶ 1).[5]   He alleges Jail staff were informed he "suffered from anxiety disorder, post-traumatic stress disorder . . . [and] bipolar disorder" and that all parties involved in the restraint chair incidents knew he had "an injured left wrist."   (Docket 62 at ¶¶ 5, 8).   Plaintiff remained in the Jail until October 30.   (Docket 49 at ¶ 1).

Plaintiff's complaint centers around multiple incidents involving use of a restraint chair in October 2017.   The restraint chair is a wheeled chair that, as its name suggests, has straps to restrain a person's movement.   The chair has shoulder, wrist, waist and ankle straps.   (Dockets 52-2 at 5:10-20 & 52-6 at 0:25-35).   Presumably, the straps can be tightened to prevent an occupant from releasing them, although the parties do not explicitly state this fact.   However, Jail video shows plaintiff removing his hand from a wrist strap during one use of the chair.   (Docket 52-2 at 4:25-30).   The record indicates he also removed a leg from the strap during another use.   (Docket 49 at ¶ 13).

### A.   October 5

On October 5, plaintiff resided in "Pod B," a specific section of the Jail.[6] (Docket 49 at ¶ 2).   The inmates failed to clean the pod, as required by Jail rules, and CO Ulrich took the pod's television privileges.   Id.; Docket 57-2.   Plaintiff became upset because he believed inmates in other pods were not penalized for

---

[5]The court cites to defendants' statement of material facts where plaintiff admits the cited fact.   Disputed facts are addressed individually.

[6]The parties did not place video of the October 5 incident into the record.

failing to clean.   (Docket 57-1 at p. 1).   He slammed his cell door closed and started kicking it.   Id.   The cell doors are made of metal and the parties agree it is dangerous to kick them.   (Docket 49 at ¶¶ 5, 52).   Plaintiff told CO Ulrich he intended to kick the cell door "until he died."   (Docket 57-1 at p. 2).   Plaintiff's actions caused "a disturbance" in the pod.   (Docket 49 at ¶ 5).

Jail staff decided to place plaintiff in the restraint chair.[7]   Id. at ¶ 6. Once it was decided to restrain plaintiff, Jail officials, including CO Fitzpatrick locked Pod B down and called Sturgis police officers for backup.   (Docket 56-1 at p. 1).   Officers attempted to handcuff plaintiff before removing him from his cell, but he "repeatedly was not compliant."   (Docket 57-1 at p. 1).   Officers then entered the cell, but plaintiff said "they would have to tase him" to remove him from the cell.   (Docket 49 at ¶ 9).   Officers, including CO Fitzpatrick, forcibly handcuffed plaintiff, who "struggled greatly to get loose . . . and screamed at the officers to tase him."[8]   Id. at ¶¶ 10-11.   A Sturgis officer handcuffed one of plaintiff's arms, allowing CO Fitzpatrick to gain control of that arm.   Id. at ¶ 11. "A second set of handcuffs were [sic.] placed on the other arm[.]"   Id.   After he

---

[7]Defendants assert they needed to use a restraint chair "for [plaintiff's] own safety, to gain control over him, and to restore order to and keep the peace of the Pod."   (Docket 49 at ¶ 6).   Plaintiff objects to the safety rationale.   (Docket 61 at ¶ 6).   He does not explain his objection or support it with record evidence.

[8]Plaintiff objects to describing his behavior during the handcuffing process as non-compliant, but does not object to the facts recounted in this paragraph. (Docket 61 at ¶¶ 8-12).   Plaintiff clearly did not comply with the orders of Jail staff and law enforcement officers, who had to use force to restrain him.   The objection is overruled.

5

was handcuffed, CO Fitzpatrick and a Sturgis officer "escorted" plaintiff out of his cell and placed him in the restraint chair.   Id.

Plaintiff asserts he told officers he was "very afraid of being held down or smothered" and did not want to be restrained in the chair.   (Docket 62 at ¶ 6). He also asserts he "screamed" that officers "were placing too much pressure on his injured wrist" and "indicated multiple times that he was in pain[.]"   Id. at ¶ 7. In his contemporaneously-written incident report, CO Fitzpatrick stated plaintiff screamed that officers "were hurting him . . . against his constitutional rights." (Docket 56-1 at p. 1).   Plaintiff describes his resistance to the restraint chair as an "attempt[] to alleviate the pain caused by the force officers were using to restrain [his] injured wrist."   (Docket 62 at ¶ 9).

Plaintiff, confined to the restraint chair, was placed in a detox cell alone. (Docket 56-1 at p. 1).   Jail staff observed plaintiff removed a leg from the straps and officers entered the detox cell.   Id.; Docket 49 at ¶ 13.   Plaintiff removed his left arm from the strap and CO Fitzpatrick "gained positive control of his left arm so he could not harm [CO Fitzpatrick] or other staff."   (Docket 56-1 at p. 1). Plaintiff alleges CO Fitzpatrick held his arm "so tight that his hand was purple[,]" spurring another officer to check his circulation by pushing on a fingernail. (Docket 62 at ¶¶ 11-12).   Plaintiff told officers he was having a panic attack. (Docket 56-1 at p. 1).   Plaintiff, after a medical checkup, was released from the

chair.[9]   (Docket 49 at ¶¶ 13-14).   The record does not disclose how long plaintiff was restrained in the chair.

As a result of the October 5 use of the restraint chair, plaintiff alleges he suffered injury to his left wrist and right shoulder.   Id. at ¶¶ 57-58.   He asserts his left wrist was "extremely damaged" and suffered bruising and swelling.   Id. at ¶¶ 57, 58 & 60.   He also claims he suffered "impedance of oxygen flow." (Docket 55-3 at p. 2).

### B.    October 29

According to plaintiff, Jail staff ordered him to move to Pod A on October 22.[10]   (Docket 62 at ¶ 15).   Plaintiff had conflicts with inmates in Pod A.   Id. He had a "severe panic attack" in response to the order and staff placed him in a detox cell.   Id. at ¶ 16.   Officers "threatened" plaintiff with use of the restraint chair, which further aggravated his panic attack.   Id. at ¶ 18.   He was taken to a hospital and given "intravenous medicine," which calmed the panic attack.   Id. at ¶ 19.   Plaintiff was not placed in the restraint chair.   Id. at ¶ 18.

On October 29, plaintiff was "on lockdown" after fighting with another inmate.   (Docket 49 at ¶ 15).   Plaintiff asked CO Fitzpatrick and another correctional officer, Cindy Costello, for a shower, arguing he "had a right to be let out of lockdown" for the shower.   (Docket 53-1).   CO Costello denied the

---

[9]Plaintiff asserts medics found his heart rate and blood pressure to be elevated, but did not file any records from the evaluation.   (Docket 62 at ¶ 14).

[10]The only evidence describing events of October 22 is plaintiff's deposition testimony.   (Docket 62 at ¶¶ 15-19).

request after consulting with her supervisor, Correctional Officer Bernard Tveidt. Id.; see also Docket 51.   Plaintiff then threatened CO Fitzpatrick, calling him a "bitch ass mother fucker" and yelling that he would "kick [CO Fitzpatrick's] ass" if he were not locked in the cell.   (Docket 56-2).   COs Fitzpatrick and Costello left plaintiff's pod.   Id.   Plaintiff began kicking his cell door.   Id.   Jail staff decided to place plaintiff in the restraint chair for "his own safety, to gain control over him, and to restore order to and keep the peace of the Pod."   (Docket 49 at ¶ 19).

Jail staff called Sturgis police officers to assist in restraining plaintiff.   Id. at ¶ 20.   At approximately 3:17 p.m., the officers, along with COs Fitzpatrick, Costello and Tveidt, returned to plaintiff's cell with the restraint chair and found him stripped to his boxers and covered in shampoo.   Id. at ¶ 21; Docket 51-1. Plaintiff willingly sat in the chair and allowed officers to restrain him with the chair's shoulder and waist straps.   (Docket 49 at ¶ 22).   However, he refused to "unclasp his hands" and place them into the wrist restraints.   Id.   CO Fitzpatrick and a Sturgis police officer attempted to pull plaintiff's arms apart, with CO Fitzpatrick pulling on plaintiff's right arm.   Id. at ¶ 23.   The officers were unsuccessful.   Id.   Plaintiff voluntarily unclasped his hands and placed them in the restraints.   Id.   Plaintiff told the officers that CO Fitzgerald had hurt his left arm.   (Docket 56-3).   The officers wheeled plaintiff into a detox cell. Id.

8

Defendants placed a video from the detox cell into the record.   (Docket 52-2).   The video shows plaintiff between 3:23 p.m. and 3:40 p.m. on October 29, loudly shouting for "Tasha" and scooting the chair around the cell.[11]   Id.   At approximately 3:39 p.m., plaintiff complained of chest pains and Jail staff summoned an ambulance.   (Docket 51-1).   Medics cleared plaintiff to return to the detox cell.   (Docket 49 at ¶ 25).   Correctional Officer Tyrel Droppers then made a deal with plaintiff: he would give plaintiff desired items such as books and a towel if plaintiff would "behave himself" for the evening.   Id. at ¶ 26.   He gave the items to plaintiff and removed him from the restraint chair at approximately 5:10 p.m.   Id. at ¶ 27.

At approximately 9:30 p.m. on October 29, plaintiff, still in the detox cell, requested a pencil and paper to write a grievance to the Jail Administrator.   Id. at ¶ 28; Docket 52-3 at 0:24-37.   CO Tyrel Droppers denied the request, explaining he needed to speak to a supervisor because of plaintiff's lockdown status.   (Docket 49 at ¶ 29).   Plaintiff became agitated.   He piled his cell items in front of the door, put wet toilet paper over the cameras in the cell and started "yelling and banging" on the cell door.   Id. at ¶¶ 30-31; see also Docket 52-3.   Jail staff again decided to place plaintiff in the restraint chair and requested backup from Sturgis police officers.   (Docket 49 at ¶¶ 33-34).

---

[11]Tasha appears to refer to plaintiff's girlfriend, Natasha Heck.   Ms. Heck was incarcerated with plaintiff at the Jail, but they were not supposed to have contact.   (Docket 55-1 at p. 2).

When the officers arrived and placed the restraint chair in front of the detox cell door, plaintiff began shouting, refusing to sit in the chair.   (Docket 52-3 at 10:30-12:55).   At one point, he walked from the back of the cell toward the officers, before retreating.   Id. at 11:30-37.   In response to an order to get in the restraint chair, plaintiff can be heard yelling that he has been shot before. What appear to be laser sights are visible on the cell floor.   Id. at 12:40-52.   A police officer is seen with a weapon, possibly a taser, emitting the laser sights. Id. at 13:30.   The police officers ordered plaintiff to turn around and put his hands behind his back to be handcuffed.   After approximately a minute of refusal, plaintiff complied and was handcuffed.   Id. at 12:55-13:55.   Plaintiff shouted, apparently in pain, as he was handcuffed.   Id.

The officers walked plaintiff out of the detox cell to the restraint chair, which was sitting at the cell door.   Plaintiff resisted sitting in the chair.   (Docket 49 at ¶ 37).   Video shows him shouting at the police officers, arching his back, squirming and kicking to avoid being strapped into the chair.   (Docket 52-4 at 0:00-2:15).   Six officers, a mix of police and Jail officers, were required to strap plaintiff in.   Id.   The officers had to hold plaintiff's limbs down and twist them to force them into restraints.   Id.   A police officer is also seen holding plaintiff's head.   Id.   At approximately 9:53 p.m., the officers succeeded in forcing plaintiff into the chair.   (Docket 58-1 at p. 1).   He was placed in another detox cell.   Id.   Plaintiff alleges the officers used excessive force during this encounter and that he was "slammed down on his injured hand."   (Docket 62 at ¶¶ 27-28).

10

Shortly after being restrained, plaintiff requested medical attention. (Docket 49 at ¶ 38).   Medics evaluated plaintiff and cleared him to stay at the Jail.   Id.   At approximately 12:45 a.m. of October 30, plaintiff requested medical attention due to shoulder and chest pain.   Id. at ¶ 40; Docket 58-1 at p. 2.   The medics, in consultation with an emergency room doctor, decided to transport plaintiff to the hospital for evaluation.   (Dockets 49 at ¶ 41 & 58-1 at p. 2).   In his complaint, plaintiff alleges it "took more than 2 hours for [his] heart rate to slow down to a level that would allow him to be released from the hospital."   (Docket 23 at ¶ 90).   However, the summary judgment record contains no information about the reason plaintiff was taken to the hospital or any conditions treated there.   Plaintiff was returned to the Jail at approximately 3:30 a.m. and was placed in a detox cell "without any issues."   (Docket 58-1 at p. 2).

CO Tyrel Droppers' incident report suggests plaintiff was restrained in the chair between approximately 9:53 p.m. and when the medics were called a second time at 12:45 a.m.   (Docket 58-1 at pp. 1-2).   Jail staff did not place plaintiff in the restraint chair again after his return from the hospital.   Id. at p. 2.   As a result of the October 29 restraints, plaintiff alleges he suffered a large leg bruise, a neck injury and a bruise on his left wrist.   (Docket 49 at ¶¶ 59-60).

## C.   October 30

At approximately 1 p.m. on October 30, plaintiff asked CO Monte Droppers for a pencil and paper.   Id. at ¶ 44.   CO Monte Droppers' incident report states

plaintiff told him jail staff "mite [sic.] as well bring in the chair as [plaintiff] was going to start up as we was [sic.] not giving him his right [sic.] as in paperwork, pencil, bible and Legal work." (Docket 54-1). Plaintiff also asked for a shower. (Docket 62 at ¶ 33). He alleges that he had urinated on himself twice while restrained in the chair on October 29. Id. CO Monte Droppers denied both requests.[12] (Docket 49 at ¶¶ 44-46).

At approximately 1:14 p.m. plaintiff began kicking the cell door. (Dockets 49 at ¶ 47 & 52-5). He also covered a camera with wet toilet paper. Id. Jail video records defendant shouting loudly. (Docket 52-5). The sound of plaintiff kicking the cell door is also quite loud. Id. Jail staff decided to put plaintiff in the restraint chair. (Docket 49 at ¶ 48). Defendants assert the decision was made for plaintiff's safety, to gain control over him and to restore order. Id. Plaintiff argues use of the restraint chair caused him to become more disruptive, due to his mental health conditions, and that Jail staff used the chair to punish him. (Dockets 61 at ¶ 48 & 62 at ¶ 39).

---

[12]The parties dispute why CO Monte Droppers denied the shower request. Defendants assert—supported by the contemporaneous jail incident report—the shower was denied because CO Monte Droppers needed to have other deputies present for backup, given plaintiff's chaotic behavior. (Dockets 49 at ¶ 45 & 54-1). Plaintiff argues, based only on his own deposition testimony, that the shower was denied as punishment for his habit of banging on the cell door and because the Jail intended to send him to another facility. (Docket 62 at ¶¶ 34-36). Because the court finds below that plaintiff did not properly allege a claim that defendants violated his constitutional rights by denying him a shower, see infra Section IV.C.3, this dispute is immaterial and the court declines to settle it.

12

At approximately 1:20 p.m., after initially refusing, plaintiff willingly sat in the restraint chair.   (Docket 52-6).   No force was used to restrain plaintiff in the chair.   Id.   The record does not indicate how long plaintiff was restrained in the chair on the afternoon of October 30, but he was transferred out of the Jail later that day.   (Docket 49 at ¶ 50).

## II.    Legal Standards

### A.    Summary judgment

Under Federal Rule of Civil Procedure 56(a), a movant is entitled to summary judgment if the movant can "show that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a).   Once the moving party meets its burden, the nonmoving party may not rest on the allegations or denials in the pleadings, but rather must produce affirmative evidence setting forth specific facts showing that a genuine issue of material fact exists.   Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 256 (1986).   Only disputes over facts which might affect the outcome of the case under the governing substantive law will properly preclude summary judgment. Id. at 248.   "[T]he mere existence of *some* alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no *genuine* issue of *material* fact." Id. at 247-48 (emphasis in original).

If a dispute about a material fact is genuine, that is, if the evidence is such that a reasonable jury could return a verdict for the nonmoving party, then

13

summary judgment is not appropriate.   Id.   However, the moving party is entitled to judgment as a matter of law if the nonmoving party failed to "make a sufficient showing on an essential element of her case with respect to which she has the burden of proof."   Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986). In such a case, "there can be 'no genuine issue as to any material fact,' since a complete failure of proof concerning an essential element of the nonmoving party's case necessarily renders all other facts immaterial."   Id. at 323.

In determining whether summary judgment should issue, the facts and inferences from those facts must be viewed in the light most favorable to the nonmoving party.   Matsushita, 475 U.S. at 587-88 (1986).   The key inquiry is "whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law."   Anderson, 477 U.S. at 251-52.

**B.   Qualified immunity**

"Public officials are immune from suit under 42 U.S.C. § 1983 unless they have violated a statutory or constitutional right that was clearly established at the time of the challenged conduct."   City & Cty. of San Francisco, Calif. v. Sheehan, 135 S. Ct. 1765, 1774 (2015) (internal quotation omitted).   Resolving questions of qualified immunity requires undertaking two inquiries.   The first asks: "[t]aken in the light most favorable to the party asserting the injury, do the facts alleged show the officer's conduct violated a constitutional right?"   Saucier v. Katz, 533 U.S. 194, 201 (2001).   Second, the court must "ask whether the

14

right was clearly established." Id.   A negative outcome to either inquiry results in qualified immunity for the official.   Pearson v. Callahan, 555 U.S. 223, 236 (2009).

"A clearly established right is one that is sufficiently clear that every reasonable official would have understood that what he is doing violates that right." Mullenix v. Luna, 136 S. Ct. 305, 308 (2015) (internal quotation omitted).   There need not be "a case directly on point for a right to be clearly established" but "existing precedent must have placed the statutory or constitutional question beyond debate." Kisela v. Hughes 138 S. Ct. 1148, 1152 (2018) (internal quotation omitted).   The Supreme Court has "repeatedly told courts . . . not to define clearly established law at a high level of generality." Id. (internal quotation omitted).   "[T]he clearly established law must be particularized to the facts of the case." White v. Pauly, 137 S. Ct. 548, 552 (2017) (internal quotation omitted).   "The plaintiffs have the burden of showing that the law was clearly established." Estate of Walker v. Wallace, 881 F.3d 1056, 1060 (8th Cir. 2018).

"[Q]ualified immunity is important to society as a whole[.]" Pauly, 137 S. Ct. at 551 (internal quotation omitted).   Accordingly, "[q]ualified immunity gives government officials breathing room to make reasonable but mistaken judgments and protects all but the plainly incompetent or those who knowingly violate the law." Stanton v. Sims, 571 U.S. 3, 6 (2013) (internal quotations omitted).   "Officials are not liable for bad guesses in gray areas; they are liable

15

for transgressing bright lines."   <u>Ambrose v. Young</u>, 474 F.3d 1070, 1077 (8th Cir. 2007).

## IV.   Analysis

The court examines each set of plaintiff's claims in turn and grants summary judgment to defendants on each claim.

### A.   Excessive force

Plaintiff asserts excessive force claims against COs Urlich, Fitzpatrick and Monte Droppers.   (Docket 23 at ¶¶ 100-102, 106-108).   His complaint alleges these officers "used force in a sadistic and malicious manner upon Plaintiff for the purpose of causing him injury[,]" violating his Eighth and Fourteenth Amendment rights.   <u>Id.</u> at ¶¶ 101, 107.   The court first finds the officers did not violate plaintiff's constitutional rights and proceeds to hold, in the alternative, that whatever right may have been violated was not clearly established, entitling the officers to qualified immunity.

#### 1.   Constitutional violation

Although the Eighth Amendment does not apply to pretrial detainees, as both parties note in their summary judgment briefing, the distinction is of little difference.   "Because the plaintiff[] [was a] pretrial detainee[], [his] relevant constitutional rights arise under the Due Process Clause of the Fourteenth Amendment.   The Due Process Clause protects a pretrial detainee from the use of excessive force that amounts to punishment."   <u>Edwards v. Byrd</u>, 750 F.3d 728, 732 (8th Cir. 2014) (internal quotations and alterations omitted).   "[T]he

16

Fourteenth Amendment gives state pretrial detainees . . . rights which are at least as great as the Eighth Amendment protections available to a convicted prisoner."   Smith v. Conway Cty., Ark., 759 F.3d 853, 858 (8th Cir. 2014) (internal quotation omitted).

To prevail on his excessive force claims, plaintiff "must show only that the force purposely or knowingly used against him was objectively unreasonable." Kingsley v. Hendrickson, 135 S. Ct. 2466, 2473 (2015).

> [O]bjective reasonableness turns on the facts and circumstances of each particular case.  A court must make this determination from the perspective of a reasonable officer on the scene, including what the officer knew at the time, not with the 20/20 vision of hindsight. A court must also account for the legitimate interests that stem from the government's need to manage the facility in which the individual is detained, appropriately deferring to policies and practices that in the judgment of jail officials are needed to preserve internal order and discipline and to maintain institutional security.

> Considerations such as the following may bear on the reasonableness or unreasonableness of the force used: the relationship between the need for the use of force and the amount of force used; the extent of the plaintiff's injury; any effort made by the officer to temper or to limit the amount of force; the severity of the security problem at issue; the threat reasonably perceived by the officer; and whether the plaintiff was actively resisting.

Id. (internal quotations, citations and alterations omitted).   The factors listed in Kingsley are not exclusive, but "only . . . illustrate the types of objective circumstances potentially relevant to a determination of excessive force."   Id.

### a.    COs Ulrich & Monte Droppers

COs Ulrich and Monte Droppers cannot have violated plaintiff's right to be free of excessive force because there is no evidence they used force against him at

17

all.[13]   CO Ulrich was only involved in the October 5 incident.   She revoked Pod B's television privileges, which agitated plaintiff, leading to Jail staff's decision to place him in the restraint chair.   But CO Ulrich did not participate in the physical acts of forcibly handcuffing plaintiff and placing him in the chair. Police officers and other Jail officers, including CO Fitzpatrick, undertook those tasks.   CO Ulrich did not use excessive force against plaintiff and consequently did not violate his constitutional rights.

CO Monte Droppers only participated in the October 30 restraint chair use.   However, no force was used at all during this incident.   After briefly arguing with Jail staff, plaintiff willingly sat in the restraint chair and allowed staff to fasten the restraints.   CO Monte Droppers did not violate plaintiff's constitutional rights.

### b.   CO Fitzpatrick on October 5

CO Fitzpatrick was involved in the incidents on October 5 and 29.   On October 5, Jail staff decided to restrain plaintiff after he caused a disturbance by repeatedly kicking his cell door.   Plaintiff refused to be handcuffed, necessitating the use of force.   CO Fitzpatrick assisted police officers in forcibly handcuffing plaintiff and placing him in the restraint chair.   He took control of at least one of plaintiff's arms while plaintiff struggled and screamed.   The record on this incident—which includes no video—does not disclose whether force was required to place plaintiff in the chair.   Later that same day, CO

---

[13]To the extent plaintiff intended to argue the use of a restraint chair is *per se* excessive, that argument is rejected below.   See infra Section IV.C.1.

Fitzpatrick held plaintiff's arm, allegedly so tightly as to turn the arm purple, while awaiting medical attention.   Plaintiff asserts he suffered injury to his left wrist and right shoulder.   He also suffered impedance of oxygen flow.   Plaintiff does not explain how his oxygen intake was impeded.

Applying the Kingsley factors to the October 5 use of the restraint, the court finds "amount of force used" was proportional to the circumstances. Kingsley, 135 S. Ct. at 2473.   The "severity of the security problem"—plaintiff's refusal to stop kicking the cell door—was not high, but neither was it minimal. Id.   Plaintiff acknowledged kicking the door was unsafe and, as seen in videos of the October 30 incident, it generates loud and disruptive noise.   Jail staff's decision to restrain plaintiff in response to his agitation and door kicking was reasonable.

Plaintiff then escalated the situation by refusing to willingly sit in the chair or allow himself to be handcuffed.   His "active[] resist[ance]" required CO Fitzpatrick to use force to handcuff him.   Id.   Plaintiff's struggle also raised the risk of injury to officers, further justifying the use of force.   This is not a situation where officers used force as punishment or themselves created the situation requiring the use of force.   Plaintiff, angered by the loss of television privileges, loudly kicked his cell door and refused to quit, forcing Jail staff to restrain him and leading to the use of force.   "Appropriately deferring to" the need of "jail officials . . . to preserve internal order and discipline and to maintain institutional security[,]" the court finds CO Fitzpatrick did not violate plaintiff's

19

constitutional rights by forcibly handcuffing him on October 5.   Id. (internal quotation omitted).

The court likewise concludes that CO Fitzpatrick committed no constitutional violation when he grasped plaintiff's arm while waiting for the medics.   At that point, plaintiff had shown himself to be uncooperative and capable of physical resistance.   It would have been reasonable to suspect plaintiff—who had just removed his arm from the chair's wrist restraint—might be contemplating further physical struggle.   Tightly holding plaintiff's unrestrained arm was a reasonable response to that potential threat.[14]

Plaintiff's primary argument against the court's conclusions is that Jail officials knew about his mental illnesses and physical injuries, rendering it "not objectively reasonable to escalate the situation to using the force of a restraint chair on October 5th."   (Docket 59 at p. 12).   Assuming for the purposes of summary judgment that Jail staff knew about plaintiff's conditions, the court finds those conditions do not change the reasonableness calculus.

It is true that a detainee's physical condition is a factor to be considered in determining whether a jailer's use of force is reasonable.   Smith, 759 F.3d at 860-61 (weighing detainee's back pain in determining if tasing was reasonable).

_____

[14]Although plaintiff alleges his left wrist was "extremely damaged," he does not allege it was broken, strained, twisted or otherwise seriously injured. (Docket 49 at ¶ 57).   In fact, the record contains little description of plaintiff's injuries.   The court finds there is no genuine dispute of material fact as to whether the "extent of the plaintiff's injury" weighs in favor of concluding CO Fitzpatrick's grasp on his left arm was an unreasonable use of force.   Kingsley, 135 S. Ct. at 2473.

But CO Fitzpatrick's use of force was never excessive—that is, the court cannot conceive of how he and the other officers could have controlled plaintiff's disruptive behavior and physical resistance in a manner that did not involve manipulating his wrist.   Officers had to secure plaintiff's limbs, including his left wrist, in some manner.   Plaintiff's active physical resistance meant that officers needed to use force to secure his limbs.   The officers used a proportional amount of force for the task.   The use of force was therefore reasonable, even if it resulted in some injury to plaintiff's wrist.

The crux of plaintiff's argument appears to be that his mental conditions made it unreasonable to use a restraint chair.   This argument does not account for the officers' need to physically control plaintiff, given his disruptive activities. Because plaintiff refused to calmly remain in his cell, instead engaging in disruptive behavior, Jail staff had no choice but to restrain him in some way. Plaintiff's mental health conditions do not change the fact that use of handcuffs and a restraint chair was proportional to the need.[15]   See Blazek v. City of Iowa City, 761 F.3d 920, 923 (8th Cir. 2014) (noting approval of handcuffing, forcibly throwing an arrestee to the ground and use of officer's body weight as methods of restraint of a "passively resistant" arrestee).

---

[15]Plaintiff argues officers "rarely attempted to temper or limit the amount of forced they used . . . often resorting to the restraint chair right after he started yelling or banging on his cell door."  (Docket 59 at p. 9).   Employing a restraint chair is a limited use of force that the officers were entitled to use as a first measure.

Here, plaintiff was "actively resisting" restraint, permitting officials to use more coercive methods such as handcuffs and a restraint chair.   <u>Kingsley</u>, 135 S. Ct. at 2473.   Plaintiff's mental health conditions and the anguish he suffered as a result of placement in the chair do not establish a constitutional violation on these facts.   See <u>Chambers v. Pennycook</u>, 641 F.3d 898, 906 (8th Cir. 2011) ("The degree of injury should not be dispositive, because the nature of the force applied cannot be correlated perfectly with the type of injury inflicted. . . . The governing rule should not turn on such unpredictable and fortuitous consequences of an officer's use of force.").

### c.   CO Fitzpatrick on October 29

Plaintiff was placed in a restraint chair twice on October 29, once in the afternoon and once in the evening.   However, CO Fitzpatrick was only involved in the afternoon incident.   There, Jail staff decided to restrain plaintiff after he threatened CO Fitzpatrick and began kicking his cell door.   Plaintiff willingly sat in the restraint chair, but refused to unclasp his hands and place them in the wrist restraints.   CO Fitzpatrick and a Sturgis police officer attempted to pull plaintiff's hands apart; CO Fitzpatrick took plaintiff's right arm.[16]   They were unsuccessful.   Plaintiff then voluntarily placed his hands in the restraint.

Plaintiff characterizes this use of force as excessive.   (Docket 59 at p. 13). He asserts his left arm was injured as a result of the incident.   (Docket 62 at ¶ 23).   The court finds the use of force was reasonable.   As noted above, CO

_____

[16]Plaintiff does not dispute these facts.   (Dockets 49 at ¶ 23 & 61 at ¶ 23).

22

Fitzpatrick and other Jail staff were entitled to control plaintiff's disruptive behavior by placing him in a restraint chair, by reasonable force if necessary. See supra Section IV.A.1.b.   Attempting to defeat plaintiff's resistance and restrain him by pulling his arms apart in order to secure them in straps was reasonable.   Plaintiff does not complain of injury to his right arm, which CO Fitzpatrick manipulated, and the officer restraining his left arm is not a defendant.   CO Fitzpatrick did not violate plaintiff's constitutional rights by pulling on his right arm and placing him in a restraint chair.

Plaintiff also challenges the use of the restraint chair during the evening of October 29.   But neither CO Fitzpatrick nor any named defendant was involved in placing him in the restraint chair during that incident.[17]   The record indicates CO Tyrel Droppers, Jail Administrator Bob Lerhkamp, as well as unnamed Sturgis police officers and Jail correctional officers restrained defendant on the evening of October 29.   (Dockets 52 at ¶ 8, 58 at ¶¶ 9-11 & 58-1).   Plaintiff did not sue these individuals.   His excessive force claim against CO Fitzpatrick cannot extend to the restraint chair use during the evening of October 29.

---

[17]Plaintiff's argument that officers could have avoided the use of force by giving plaintiff writing materials to allow him to file a grievance is immaterial because no named defendant participated in this incident.   (Docket 59 at p. 9). In any event, "[t]he question is not whether the jailers did all they could have, but whether they did all the Constitution requires."   Mendoza v. United States Immigration & Customs Enf't., 849 F.3d 408, 419 (8th Cir. 2017) (internal quotation omitted).

23

### 2.    Qualified immunity

Although the court's conclusion that COs Urlich, Fitzpatrick and Monte Droppers did not violate plaintiff's constitutional rights is sufficient to end the analysis, see Pearson, 555 U.S. at 236, the court finds in the alternative plaintiff did not show the rights he seeks to vindicate were clearly established in October 2017.   In this circuit, a § 1983 plaintiff bears the burden to show a right is clearly established.   Estate of Walker, 881 F.3d at 1060.

Plaintiff's showing on this crucial question of law is insufficient.   His summary judgment brief articulates the right at issue as the right for "a pretrial detainee" to be "protected from the use of excessive force amounting to punishment."   (Docket 59 at p. 8).   He only cites Kingsley in support of this argument.   Id. at p. 9.

Kingsley and earlier Supreme Court cases clearly established the general principle that pretrial detainees may not be punished by October 2017.   135 S. Ct. at 2473; see also Bell v. Wolfish, 441 U.S. 520, 534 (1979).   But the Court's "longstanding principle that clearly established law should not be defined at a high level of generality" demands more than a simple citation to Kingsley. White, 137 S. Ct. at 552 (internal quotations omitted).   "[T]he clearly established law must be *particularized* to the facts of the case."   Id. (internal quotation omitted) (emphasis added).   "Use of excessive force is an area of the law in which the result depends very much on the facts of each case, and thus . . . officers are entitled to qualified immunity unless existing precedent squarely governs the

24

specific facts at issue." <u>Kisela</u>, 138 S. Ct. 1148, 1153 (2018) (internal quotations omitted).

In 2016, the Southern Division of this court concluded it was not clearly established as of 2014 "that the use of a restraint chair constitutes excessive force, especially when the chair is used to restore order, keep the peace, establish control, or maintain security."   <u>Clark v. Gross</u>, 15-CV-04068, 2016 WL 6638095 at *17 (D.S.D. Oct. 3, 2016), <u>report and recommendation summarily adopted by</u> <u>Clark v. Gross</u>, 2016 WL 6637941 (D.S.D. Nov. 9, 2016). Plaintiff did not show any "controlling authority or . . . robust consensus of cases of persuasive authority" holding the use of a restraint chair constitutes excessive force has emerged since <u>Clark</u>.   <u>District of Columbia v. Wesby</u>, 138 S. Ct. 577, 589-90 (2018) (internal quotations omitted).   As the burden is on plaintiff to show the right he seeks to vindicate was clearly established, this omission is fatal.

The court conducted its own search for any authority regarding the use of restraint chairs and, like the court in <u>Clark</u>, found little.   In 2015, the United States Court of Appeals for the Third Circuit concluded a jury question existed as to whether jailers violated the Eighth Amendment rights of a passively resistant prisoner with severe mental illness by leaving him naked in a restraint chair for 14 hours.   <u>Young v. Martin</u>, 801 F.3d 172, 174-76, 80-82 (3d Cir. 2015).   In <u>Young</u>, the prisoner disrupted jail activities by leaving his cell, sitting on a ledge and shouting about prisoners' rights.   <u>Id.</u> at 174.   He submitted to handcuffing

25

but "passively refused to walk[,]" forcing his jailers to carry him.   Id.   He never

"verbally threaten[ed] or attempt[ed] to physically engage" any jail staff.   Id.

Nevertheless, jail staff placed him in a restraint chair and left him there, naked,

for 14 hours, albeit with medical observation.   Id. at 175.   The Third Circuit

found the facts required a jury to determine if jailers used excessive force, but

declined to determine if the jailers were entitled to qualified immunity.   Id. at

180, 82.

   In 2013, the United States Court of Appeals for the Tenth Circuit held the

"use [of] restraints with the express purpose of punishing or without *some*

legitimate penological purposes in mind" on a pretrial juvenile detainee violated a

clearly established Fourteenth Amendment right as of 1997.   Blackmon v.

Sutton, 734 F.3d 1237, 1242-43 (10th Cir. 2013) (Gorsuch, J.) (emphasis in

original).   In Blackmon, juvenile detention center officials confined an

eleven-year-old to a restraint chair "to prevent [him] from killing or seriously

injuring himself" but "*sometimes* . . . with the express purpose of punishing

him[.]"   Id. at 1242 (emphasis in original).

   These cases do not show a clearly established right applicable to this case.

Here, plaintiff was disruptive, like the prisoner in Young.   But unlike Young,

plaintiff escalated his disruptive behavior to active resistance, with aggressive

actions and physical struggle.   He refused to comply with officers' orders,

necessitating the use of force to restrain him.   And again unlike Young, the

record does not suggest the periods of restraint were especially lengthy.[18] Young does not govern.

Nor does Blackmon.   Blackmon concerned a juvenile detainee with suicidal behavior who was restrained as punishment.   Although plaintiff has mental health conditions, the record does not indicate he was suicidal.   Unlike the detainee in Blackmon, plaintiff is a grown man who physically resisted Jail staff—and also acted aggressively against them at times—necessitating some method of restraint.   And, as discussed below, see infra Section IV.C.1, there is no genuine dispute of material fact as to whether Jail staff used the restraint chair as punishment.   Blackmon is too dissimilar to supply clearly established law for this case.

Plaintiff failed to show the use of a restraint chair on a disruptive, physically resistant pretrial detainee as a method of control violates any clearly established constitutional right.   Nor has the court been able to locate case law establishing that right.   COs Ulrich, Fitzpatrick and Monte Droppers are entitled to qualified immunity on plaintiff's excessive force claims.

**B.    Failure to train**

Plaintiff alleges Sheriff Merwin "failed to properly train, supervise, and discipline" COs Ulrich, Fitzpatrick and Monte Droppers "regarding the permissible uses of a restraint chair and the required safeguards of using a

---

[18]The record does not disclose how long the restraint periods lasted on October 5 and the afternoon of October 30, but subsequent events make clear neither period was 14 hours long, as in Young.

restraint cha[ir] on individuals with physical injuries or psychological disorders."
(Docket 23 at ¶ 110).   He further alleges this failure to train "amounts to
deliberate indifference" to his rights.   Id. at ¶ 111.   The court finds Sheriff
Merwin is entitled to summary judgment on this claim.

Two separate standards govern the components of this claim.   "In order to
establish a claim for failing to supervise[,]" plaintiff must show Sheriff Merwin "1)
Received notice of a pattern of unconstitutional acts committed by subordinates;
2) Demonstrated deliberate indifference to or tacit authorization of the offensive
acts; 3) Failed to take sufficient remedial action; and 4) That such failure
proximately caused injury to [plaintiff]."   McGuire v. Cooper, 952 F.3d 918, 922
(8th Cir. 2020) (internal quotation omitted).

> A supervisor's failure to train an inferior officer may also give rise to
> individual liability under § 1983 if (1) the failure to train amounts to
> deliberate indifference to the rights of persons with whom the
> [officers] come into contact and (2) the alleged failure to train
> actually caused the constitutional deprivation.

Id. at 923 (internal quotations and citations omitted).   A claim for failure to train
or supervise "will automatically fail for lack of an underlying constitutional
violation."   Henry v. Johnson, 950 F.3d 1005, 1015 (8th Cir. 2020) (internal
quotation omitted).

The court concluded above that COs Ulrich, Fitzpatrick and Monte
Droppers did not violate plaintiff's constitutional rights.   See supra Section
IV.A.1.   Sheriff Merwin cannot be liable for failing to train or supervise the
officers.   To the extent plaintiff is asserting Sheriff Merwin failed to train or

28

supervise Jail staff regarding their alleged practice of using a restraint chair as punishment, the court concludes defendants had no such practice below.   See infra Section IV.C.   Summary judgment is appropriate.

### C.   Punishment of pretrial detainee

Plaintiff's complaint alleges Sheriff Merwin and COs Ulrich, Fitzpatrick and Monte Droppers had "actual or constructive knowledge of and acquiescence in the unconstitutional custom or practice of the Meade County Sheriff's Office and Meade County Jail improperly utilizing the restraint chair as punishment[.]" (Docket 23 at ¶ 113).   It further alleges use of the restraint chair as punishment violated plaintiff's Eighth and Fourteenth Amendment rights.   Id.

This portion of plaintiff's complaint is naturally read as a Monell[19] municipal liability claim.   Defendants' summary judgment brief addressed the claim as arising under Monell.   (Docket 50 at pp. 20-21).   But in his response brief, plaintiff disclaimed any reliance on a Monell theory and instead argues unspecified "defendants" or "officers" individually used a restraint chair on plaintiff as punishment.   (Docket 59 at pp. 17-18).   The court therefore construes this claim as alleging defendants Sheriff Merwin and COs Ulrich, Fitzpatrick and Monte Droppers, in their individual capacities, violated plaintiff's Fourteenth Amendment due process right to be free of punishment before trial. On this understanding, the court grants summary judgment to defendants.

---

[19]Monell v. Dep't. of Soc. Servs. of City of N.Y., 436 U.S. 658 (1978).

### 1. Constitutional violation

#### a. Sheriff Merwin & CO Ulrich

The first problem with plaintiff's claim is the record does not show Sheriff Merwin or CO Ulrich placed him in a restraint chair or ordered others to place him in a restraint chair.   There is no evidence Sheriff Merwin was ever personally involved in any restraint chair use.[20]   CO Ulrich was only involved in the October 5 incident.   As it pertains to that incident, the record discloses only that "[i]t was determined Plaintiff needed to be placed in the restraint chair" and that CO Fitzpatrick "was in control at the time[.]"   (Dockets 49 at ¶ 6 & 56-1 at p. 1).   CO Ulrich did not participate in or direct the October 5 restraint chair use.   These defendants are entitled to summary judgment.

#### b. CO Fitzpatrick

CO Fitzpatrick was involved in the incidents on October 5 and the afternoon of October 29.   For both incidents, defendants assert the decision to restrain plaintiff in the chair was made "for his own safety, to gain control over him and to restore order to and keep the peace of the Pod."   (Docket 49 at ¶¶ 6, 19).   Plaintiff objects only to the safety rationale given for the October 5 incident and admits the remainder of defendants' asserted facts.   (Docket 61 at ¶¶ 6, 19).

---

[20]In fact, the parties' respective statements of material fact—which are intended to summarize the record evidence the court must consider, see Fed. R. Civ. P. 56(c)(3)—do not mention Sheriff Merwin at all.   (Dockets 49, 61 & 62).   If Sheriff Merwin was deposed, no part of his deposition is on record.   He did not file an affidavit.   The record provides no information about his involvement in these incidents, if any.

These admissions, coupled with the court's earlier holdings, see supra Section IV.A.1.b-c, are fatal to his punishment claim against CO Fitzpatrick.

The Supreme Court "ha[s] said that 'the Due Process Clause protects a pretrial detainee from the use of excessive force that amounts to punishment.'" Kingsley, 135 S. Ct. at 2473 (quoting Graham v. Connor, 490 U.S. 386, 395 n.10 (1989)).  "[S]uch 'punishment' can consist of actions taken with an 'expressed intent to punish.'" Id. (quoting Bell, 441 U.S. at 538).  "[I]n the absence of an expressed intent to punish, a pretrial detainee can nevertheless prevail by showing that the actions are not 'rationally related to a legitimate nonpunitive governmental purpose' or that the actions 'appear excessive in relation to that purpose.'" Id. (quoting Bell, 441 U.S. at 561).

 The parties agree defendants did not act with "an expressed intent to punish[.]" Id.  Defendants used a restraint chair to control plaintiff and restore order to the Jail, as well as for his safety on the October 29 incident.  The question then becomes whether plaintiff showed a genuine dispute of material fact as to whether CO Fitzpatrick's uses of the restraint chair were "not rationally related to a legitimate nonpunitive governmental purpose or" were "excessive in relation to that purpose." Id. (internal quotations omitted).

As the court concluded above, CO Fitzpatrick was entitled to use the restraint chair on October 5 and 29 to control plaintiff's disruptive behavior and physical resistance.  See supra Section IV.A.1.b-c.  Controlling detainees is a legitimate nonpunitive governmental purpose.  See Parrish v. Dingman, 912

31

F.3d 464, 468 (8th Cir. 2019) ("Jailers . . . have an important interest in maintaining order and institutional security.").   CO Fitzpatrick's use of the restraint chair was not excessive as a method of controlling plaintiff.   In fact, the court previously held CO Fitzpatrick's use of force, including his use of the restraint chair, was reasonable and proportionate to the need presented by plaintiff's resistance.   See supra Section IV.A.1.b-c.   CO Fitzpatrick did not unconstitutionally subject plaintiff to punishment by placing him in a restraint chair on October 5 and 29.

Plaintiff argues the restraint chair was not "a safe way to gain control over" him, due to his "panicking and lashing out" caused by his mental health disorders.   (Docket 59 at p. 18).   He also contends the excessive nature of the chair's use is shown by the injuries he suffered.   Id.   Neither argument is persuasive.   The question is not whether use of the restraint chair was the safest way to gain control over plaintiff.   Plaintiff must show using a restraint chair was excessive in relation to the legitimate purpose of controlling his disruptive behavior.   Kingsley, 135 S. Ct. at 2473.   The court finds there is no genuine dispute that the use of the chair was reasonable and proportional to the need.

Plaintiff's second argument contends his injuries show excessive force. Defendants assert plaintiff's injuries were *de minimis*.   (Docket 50 at pp. 12-13). However, "there is no uniform requirement that a plaintiff show more than *de minimis* injury to establish an application of excessive force."   Chambers, 641

32

F.3d at 907.   While "[t]he degree of injury is certainly relevant insofar as it tends to show the amount and type of force used[,]" it is not "dispositive[.]"   Id. at 906.

Taking as true plaintiff's assertions of injury, they are no more than might be expected from the reasonable use of force necessary to secure plaintiff in the restraint chair.   Plaintiff suffered bruising and swelling as well as "injuries" to his right shoulder and an "extremely damaged" left wrist.   (Docket 59 at p. 18). He does not assert he suffered any permanent injury.   These injuries do not evince any genuine dispute as to an excessive use of force.   Rather, they merely show CO Fitzpatrick had to use some quantum of force to restrain plaintiff. That force was reasonable and proportional to the need presented by plaintiff's physical resistance to the restraint chair's use.

CO Fitzpatrick is entitled to summary judgment on plaintiff's punishment claim.

### c.   CO Monte Droppers

CO Monte Droppers "decided to place [plaintiff] in the restraint chair for his own safety, to gain control over him, and to restore order" on October 30. (Docket 54 at ¶ 6).   Plaintiff, angered by CO Monte Droppers' refusal to allow him to shower or give him writing materials, had been kicking his cell door, covering the cell camera with toilet paper and loudly yelling.   In response to these disruptive actions, CO Monte Droppers was permitted to use force to establish control over plaintiff and restore order.   Parrish, 912 F.3d at 468.

33

The only force used was the restraint chair itself.   Plaintiff did not resist sitting in the chair, so CO Monte Droppers and backup officers did not need to use any additional force to secure him in the chair.   Using the restraint chair to control plaintiff's behavior was reasonable and proportionate to the need.   When restrained in the chair, plaintiff was physically unable to kick the cell door or obstruct the cell cameras.   The chair had also proven to calm plaintiff during past outbursts.   Plaintiff does not allege the October 30 use of the restraint chair caused him any injury, even *de minimis* injury.   Under these circumstances, there is no genuine dispute as to whether the use of the restraint chair was punishment.   CO Monte Droppers undoubtedly used the chair to control plaintiff's disruptive behavior.[21]   He is entitled to summary judgment on plaintiff's punishment claim.

## 2.   Qualified immunity

Even if defendants did violate plaintiff's due process right to be free of punishment before his conviction under the facts of this case, he completely failed to show defendants' actions contravened clearly established law.   It is, of course, clearly established that pretrial detainees may not be subject to punishment.   <u>Kingsley</u>, 135 S. Ct. at 2473.   But this general principle is insufficient to place defendants on notice that they may have been violating the

---

[21]Plaintiff again asserts it was unsafe to control him by using a restraint chair.   (Docket 61 at ¶ 48).   The court rejects this argument for the reasons stated above.   <u>See</u> <u>supra</u> Section IV.C.1.b.

law on the present facts.   Clearly established law "must be particularized to the facts of the case."   White, 137 S. Ct. at 552.

Here, plaintiff bore the burden to show it was clearly established in October 2017 that using a restraint chair to control the behavior of a disruptive, aggressive, physically resistant pretrial detainee with mental health conditions and an injured wrist constituted impermissible punishment.   He did not make this showing.   Nor has the court been able to locate any authority establishing the necessary principle.

Defendants are entitled to qualified immunity on plaintiff's punishment claim.

### 3.    Urination claim

In his summary judgment brief, plaintiff argues defendants punished him by denying him "the opportunity to shower after he had urinated on himself twice the night of October 29, 2017, while in the restraint chair."   (Docket 59 at pp. 15-16).   Although plaintiff alleged he urinated on himself while in the chair in his complaint, his punishment claim pertains only to use of the restraint chair.   (Docket 23 at ¶¶ 73, 93 & 113).   He does not allege in his complaint that denying him access to a shower constituted punishment.   Consequently, defendants did not address this matter in their summary judgment briefing.

"A plaintiff may not amend [his] complaint through argument in a brief opposing summary judgment."   WireCo WorldGroup. v. Liberty Mut. Fire Ins. Co., 231 F. Supp. 3d 313, 318 (W.D. Mo. 2017) (quoting Gilmour v. Gates,

McDonald & Co., 382 F.3d 1312, 1315 (11th Cir. 2004)); see also United States v. Mask of Ka-Nefer-Nefer, 752 F.3d 737, 742 (8th Cir. 2014) ("[A] district court . . . is not obliged to invite a motion for leave to amend [the complaint] if plaintiff did not file one.").   Plaintiff did not allege his urination claim in his complaint and did not seek leave of the court to amend his complaint to include it.   The court will not consider it.

> ### D.   Retaliation

As with his punishment claim, there is some confusion over the legal nature of plaintiff's retaliation claim.   On this count, his complaint alleges only that Sheriff Merwin "retaliate[ed] against Plaintiff for engaging in the protected activity of filing grievances[.]"   (Docket 23 at ¶ 117).   The complaint does not explain how Sheriff Merwin allegedly retaliated against plaintiff but, the parties' summary judgment briefing assumes the claim concerns restraint chair use. (Dockets 50 at pp. 22-23 & 59 at pp. 19-21).   Plaintiff also argues in his brief that Jail staff retaliated against him by denying him "the privilege of speaking with his girlfriend and family, plac[ing] him in lockdown at certain times, and den[ying] him the privilege of taking a shower when on lockdown."   (Docket 59 at p. 20).

Plaintiff's complaint suggests he intended to bring a Monell municipal liability claim against the Meade County Sheriff's Office, with Sheriff Merwin as a figurehead defendant.   But in his summary judgment brief, he expressly disclaimed any Monell theory of liability.   (Docket 59 at p. 17).   Plaintiff's

pleading choices doom his retaliation claim.   The record contains no evidence that Sheriff Merwin personally had anything to do with plaintiff at all.   There is no evidence that Sheriff Merwin placed plaintiff in a restraint chair, whether as retaliation or for other reasons, nor is there evidence he ordered his officers to retaliate against plaintiff.   Plaintiff also did not show Sheriff Merwin was involved with his placement in lockdown or with the Jail's shower decisions.

To the extent plaintiff intended to argue in his summary judgment brief that Jail officials retaliated against him by placing him in lockdown or denying him a shower, the court notes he did not name any Jail official as a defendant in this claim.   Plaintiff cannot amend his complaint to add defendants to a claim in his summary judgment brief and he filed no separate motion to amend.

Taking the complaint as written, the court concludes plaintiff failed to put forth any evidence that Sheriff Merwin, the only defendant named in the retaliation count, retaliated against him.   Sheriff Merwin is entitled to summary judgment.

## ORDER

For the reasons given above, it is

ORDERED that defendants' motion for summary judgment (Docket 48) is granted in full.

Dated May 7, 2020.

BY THE COURT:

/s/ *Jeffrey L. Viken*
JEFFREY L. VIKEN
UNITED STATES DISTRICT JUDGE